UNITED STATES of America,
Plaintiff-Appellee,

v.

Nick SENAK, Defendant-Appellant.

No. 74–1965.

United States Court of Appeals,
Seventh Circuit.

Argued June 10, 1975.

Decided Oct. 23, 1975.

Rehearing and Rehearing En Banc
Denied Nov. 25, 1975.
Certiorari Denied March 29, 1976.
See 96 S.Ct. 1500.

**132**

Max Cohen, Gary, Ind., for defendant-appellant.

William L. Gardner, Atty., U. S. Dept. of Justice, Washington, D. C., John R. Wilks, U. S. Atty., Fort Wayne, Ind., Richard L. Kieser, Asst. U. S. Atty., South Bend, Ind., for plaintiff-appellee.

Before CLARK, Associate Justice,* FAIRCHILD, Chief Judge, and PELL, Circuit Judge.

PELL, Circuit Judge.

The defendant, Nick Senak, a lawyer, was charged with violation of 18 U.S.C. § 242 in a five count indictment. The indictment in substance charged Senak with having used his office as pauper attorney of the Lake County, Indiana, Criminal Court, to exact sums of money from a person he had been appointed to represent (Count I) and from relatives and friends of persons he had been appointed to represent (Counts II–V) by stating to such persons that he would not adequately represent the persons he had been appointed to represent unless he were paid amounts in addition to his salary; that this conduct deprived those persons of property without due process. On motion of the defendant the indictment was dismissed. The judgment of dismissal was reversed by this court and the case was remanded for further proceedings. *United States v. Senak,* 477 F.2d 304 (7th Cir. 1973), *cert. denied,* 414 U.S. 856, 94 S.Ct. 157, 38 L.Ed.2d 105. At the trial which followed, Count V was dismissed on motion of the Government on the morning of trial. At the conclusion of the Government's evidence, the district court sustained the defendant's motion for acquittal as to Count I. The jury returned a verdict of guilty on Counts II and IV (concerning James Cadle and Honore Gilarski) and not guilty on Count III (concerning Willie Drake). The defendant was sentenced to a term of imprisonment for 60 days on each of Counts II and IV to run concurrently and was fined in the total amount of $2000.00.

On this appeal, the defendant's contentions are directed to evidentiary matters (admission of a witness's statement as past recollection recorded; admissions of testimony of past similar acts; cross-examination of three defense witnesses; and a remark by Government counsel in closing argument), jury instructions, and denial of motions for judgment of acquittal.

### I

The evidence viewed as it must be in the light most favorable to the Government's position with regard to the two Counts on which there were convictions is in substance as follows.

### A. Count II

Cadle who lived in Detroit learned from a telephone call from his mother that his father, whom he knew to be "broke" was charged with a crime in Lake County and that he was represented by Senak. The defendant was appointed on September 20, 1966, as pauper attorney to represent the father who according to the court entry was "in Court without funds to employ counsel." Cadle borrowed $100 from a friend and went to Gary. Upon arrival there he had a telephone conversation with Senak who "said that he wasn't representing anyone until he has his fee, and it was

---

* Associate Justice Tom C. Clark (Retired) of the Supreme Court of the United States is sitting by designation.

$500." The following day Cadle went to Senak's office and saw a sign on the desk which said "Pauper's Attorney." The office was in the court house at the county seat. Cadle gave Senak the $100 and told him he would have to borrow the balance. Cadle told Senak that he thought his father was an alcoholic and should be in a hospital rather than in a prison. Senak agreed and said that if Cadle could come up with additional money that "we can see that he don't go" to prison and "we'll get him in a hospital." Cadle did not pay the additional amount. The father was sentenced to imprisonment on a guilty plea. At the time the plea was entered on October 10, 1966, Senak withdrew as pauper attorney but appeared as counsel for the father. The son was unaware of this.

Cross-examination developed some conflicts in Cadle's testimony. However, we are not the trier of facts and the conflicts were not sufficient to cause us to disregard the above summary as having been established to the satisfaction of the jury.

## B. Count IV

Steve LaPosi was charged by affidavit filed on August 12, 1967, with statutory rape (No. 39254, hereinafter No. 54) and by affidavit filed on August 14, 1967, with assault and battery with intent to gratify sexual desires (No. 39256, hereinafter No. 56). On September 13, 1967, the court's entry in No. 54 showed that the defendant was without funds and that the court appointed Pauper Attorney Senak to represent him. No similar appointment appears in the docket sheet of No. 56; however, on September 22, slightly more than a week after the defendant had been judicially found to be without funds, the defendant by "Atty Nick Senak, files verified petition to establish" the defendant as being a criminal sexual psychopathic person. The status of Senak at the outset in No. 56 is

not clear from the record. Senak testified in response to a leading question from his own counsel that he appeared as private counsel in No. 56 on September 22.[1] At one point, Senak testified, "[p]ursuant to the one sheet, it shows my appointment. Why the other sheet wasn't brought in at the same time to show my appointment, I can't tell you." This would appear to suggest that he had been appointed in the second case but that the appropriate entry had not been made. The next question concerned Senak being contacted by one [Honore] Gilarski. The following then appears in Senak's testimony:

"Q And would that have been before or about on September 22, 1967, when you appeared as private counsel in Cause No. 39256?

A That would be, as I remember, and at the same time—the other sheet I interviewed him and at the time I entered my appearance in the sheet you're talking about, I brought in the other sheet. And I told the Court to—because Mr. LaPosi wanted to retain me. And he said that a girl-friend—I believe he said that he was going to marry—was going to pay his attorney's fees. I brought in both sheets at the same time as the sheet that shows that I was appearing as private counsel."

Senak then returned to the subject of Gilarski, testifying that he told her what LaPosi was charged with, that the cases would have to be consolidated, that LaPosi had told her he wanted Senak as his attorney and she had said she was willing to pay the attorney's fees, that he was permitted to enter an appearance for LaPosi and would do the best he could under the circumstances and the type of case involved, that she would retain any lawyer she wanted but she wanted Senak because he was familiar with the case and that she gave him

---

1. Counsel had received permission from the court to get through some of the preliminary matters by leading questions.

some money at that time and some more later.

Gilarski, the girl friend of LaPosi, who was the Government witness on Count IV, testified that she first came to know Steve LaPosi in March or April of 1968, which was at least one half a year after the first contact Senak's testimony would seem to say he, Senak, had had with her about LaPosi's criminal prosecution. The docket entry in No. 56 shows that on March 22, 1968, LaPosi was A.W.O.L. from the Dr. Norman M. Beatty Memorial Hospital at which he had been earlier accepted in accordance with the trial court's commitment of him to the Division of Mental Health. Gilarski testified that she first became acquainted with LaPosi about a week after he had run away from the hospital.

Gilarski also testified that he said if she gave him any money in regard to "this case" that he would have "to withdraw as a Court-represented attorney," and appear as a private attorney. Senak did not withdraw as pauper attorney in No. 54 until July 9, 1969, the date of the one day trial in that case upon which LaPosi was found not guilty. The two cases were never consolidated and the record reflects no effort to achieve that end. Gilarski did not know that there was an assault and battery case, No. 56, until after the trial in No. 54. At that time Senak asked for about $700.00 additional "and that the total of $1200.00 that he (Nick Senak) had requested was to be split between a couple of other people. [She] could only pay about $350 sometime in the late Summer." On September 24, 1968, the State dismissed, being unable to produce any of its witnesses.

According to Gilarski, her first contact with Senak was by telephone. The conversation was initiated by Senak and he asked her to pay about $500.00 to defend Steve. She asked what the charges against LaPosi were and Senak told her it was rape.

"A. Well, I asked him what he was doing to assist Steve, and he said at that time he hadn't had a chance to talk to Steve since he had been brought from the Beatty Hospital back to the County Jail. He wasn't even sure, he told me at that time, if he was still assigned to the case." ·

Gilarski also testified that during the telephone conversation Senak said "[t]hat Steve didn't have much of a chance, but that if I came up with some money, he would have a better chance."

The telephone conversation took place in the Spring of 1968. She met Senak at the court house and made the first payment of $300.00 to him on May 29, 1968, for which he gave her a receipt. She met him again at the court house the day of the trial on No. 54 and paid him the balance. Gilarski was uncertain just when she learned Senak was the pauper attorney. He did say to her that "Steve would not have much help without me giving him the money."

II

The first contention of Senak is that the district court erred in denying his objection to improper argument by the Government in its final summation. The defense brought in a number of witnesses who testified that Senak's reputation in the community for honesty, integrity, truth, and veracity was excellent. Senak then took the stand. On cross-examination, he was asked with regard to several payment transactions which were in evidence, including the Cadle payment, whether he had included the amounts involved in his federal income tax returns for the year. It was indicated that he had not. It also appears that the amounts in question did not appear in Senak's own records which he had turned over to the I.R.S. According to the defendant on this appeal, to offset the unfavorable inference from this line of questioning, on redirect examination he testified that he had voluntarily turned over all of his books and records to the Internal Revenue Service, had answered all questions put to him by the agents and had cooperated with the agents of the Internal Revenue Service. He further testified that as a lawyer he

knew that he was entitled not to turn over any of his documents. The following. then appears in the transcript:

"Q. Did you turn over all of your records to the Internal Revenue Service voluntarily?

A. I did, sir.

Q. Did they ever have to subpoena any of your records?

A. They did not, sir."

He also testified on redirect examination that the first examination by the I.R.S. agents took two days, that there was no criminal charge filed against him in connection with the examination and that he had agreed to a deficiency because it would be prohibitively expensive to contest the matter in view of the small amount involved.

Upon recross-examination, the Government brought out that the investigation by the I.R.S. was a criminal investigation and that the deficiencies pertained to both the civil and criminal cases. The deficiencies in the criminal investigation for 1965 of $3,225 and for 1966 of $4,500 were identified by Senak as being possibly correct amounts. Upon redirect, Senak testified that he was an attorney and knew the law and would not have volunteered any records to the I.R.S. if he had committed a wilful fraud, knowing in such case that he would be subject to criminal prosecution.

In the opening summation argument of the Government, counsel after adverting generally to .the evidence of guilt, referred to the parade of character witnesses. "Those witnesses," he stated, "did not look at Nick Senak's tax returns, or did not talk to his clients." Defense counsel responded:

"And this man has been under investigation. The I.R.S. couldn't get him. So they came at him with this. Is this the conduct of a man who feels that he has committed a criminal offense? If he felt that he was cheating, defrauding the Government, not paying his taxes, a man who is a criminal defense lawyer says to the I.R.S.: 'Here. Take all my records. Look at them. I'll talk to you about everything. I'll make statements to you,' which he did.

"Is this the mark of guilt? No, this is the mark of a free and honest conscience. If you have something to hide and you know the I.R.S. is breathing down your neck, a criminal tax investigation, particularly a criminal defense lawyer, he is not going to say to them, 'Here are my books and records. Here, use my adding-machine, too. I'll help you convict me.'"

In the Government's closing argument, counsel referred to the income not reported and argued that if a person has a lawful right to that money, if he is an ethical person, he should report that as his fees. "Maybe he was cooperative with the Internal Revenue Service, but if he knows full well that if you don't hand the man the documents, then he's going to hand you a subpoena. It's as clear-cut as that." Defense counsel objected to the statement on the ground that a taxpayer in a criminal investigation does not have to volunteer anything. The trial court denied the objection, observing that he thought the defense comment was erroneous. After further colloquy, Government counsel concluded the particular subject by observing that it showed guilty knowledge.

The defendant's claim of reversible error appears to be primarily based upon the Fifth Amendment ground that an accused cannot be compelled to give evidence against himself in a criminal proceeding and is thereby protected from the compulsory production of books and papers that would tend to incriminate him, citing *U. S. v. White*, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944); *Curcio v. U. S.*, 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957); *U. S. v. Cohen*, 388 F.2d 464 (9th Cir. 1967); 58 Am.Jur. *Witnesses*, Sec. 69, p. 62, et seq. (1948). The gist of the argument is that the jury was misled into believing that the defendant's cooperation with the tax authorities was a sham and subterfuge since the Government could obtain the same information by subpoena.

As an initial matter, it is not as clear as the defendant would have us believe that an I.R.S. summons could not have forced the production of the records. In *Donaldson v. United States,* 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971), it was held that the use of the I.R.S. summons is authorized in investigating what may turn out to be criminal conduct so long as it is issued in good faith and prior to a recommendation for criminal prosecution. A discussion of guidelines for enforcement of such a summons and of the manner in which the summoned individual can claim constitutional privilege is set forth in *United States v. Awerkamp,* 497 F.2d 832 (7th Cir. 1974). The record does not help us here. It is apparent that the investigation had criminal aspects but there is no showing as to whether prosecution had been authorized. It is clear that it never occurred. We cannot say that the district court was incorrect in characterizing as erroneous the defense comment that a taxpayer in a criminal investigation does not have to volunteer anything.

We do not, however, deem it necessary to resolve this question. The first reference to the use of a subpoena to secure records did not come from the Government but occurred during the redirect examination of Senak when his own attorney, during the course of putting a gloss on his client's openness, hiding-nothing attitude, asked Senak if they ever had to subpoena any of his records. All that the prosecutor said was that if one doesn't hand over the records he will be handed a subpoena. We do not agree with the defendant that this necessarily implies more than it says, *i. e.*, that he would have had to comply with a subpoena or summons. Under any circumstances, upon the issuance of a summons Senak would have found himself in the undesirable position for a lawyer of denying compliance because to do so might incriminate him.

■ Colloquies of the sort which developed here mostly out of the fact that a substantial part of the defense was the good character of the defendant tend to resemble a snowball being pushed back and forth across an open field. The size and scope increase with each directional roll. In viewing this give-and-take which occurs in vigorously contested litigation, our principal inquiry is whether the prosecutorial remarks deprived the defendant of a fair trial. See *United States v. Cook,* 432 F.2d 1093, 1106–08 (7th Cir. 1970), *cert. denied,* 401 U.S. 996, 91 S.Ct. 1224, 28 L.Ed.2d 535 (1971). Viewing the argument as a whole, see *United States v. Greene,* 497 F.2d 1068, 1084 (7th Cir. 1974), and bearing in mind that the comment anent the subpoena was the culmination of the opening defense gambit that Senak did not require a subpoena to produce his records, we are not persuaded that the argument of the Government counsel brought about an unfair trial.

### III

Senak next contends that the district court erred in permitting the statement provided by Honore Gilarski to the FBI to be admitted as substantive evidence under the hearsay rule exception of past recollection recorded. The statement in question had been taken by two FBI agents on February 11, 1971. When Gilarski stated that she could not remember any further conversation with Senak, she was handed the two page statement for the purpose of refreshing her recollection. Upon the completion of her examination of the document, she stated that her recollection was not refreshed as to conversations she had with Senak in 1968. The Government then moved to admit the statement into evidence as past recollection recorded. After a spirited colloquy, the court indicated that it would admit the statement if the witness testified that she had read it entirely and it was true and correct. The statement was then produced and the witness testified that that part which read, "I Honore L. Gilarski, have read this and one other handwritten page, and understand it, and it is true," was in her own handwriting. She was then asked and responded:

"Q. Mrs. Gilarski, was this a true statement at the time you were interviewed by the FBI Agents in 1961?

A. Yes." [2]

■ The statement was then admitted. Numerous deficiencies in the procedure are urged, not all of which were presented to the district court. We do not conceive that any of these were deliberately waived in the trial court as a tactical matter, or for other reasons and will consider each of the asserted deficiencies. Nevertheless, in the overall evaluation of the egregiousness of the claimed error we cannot be unmindful that a litigant is not in as secure a position of complaining about a trial court ruling for the first time on appeal as he would if he had specifically brought the matter to the attention of the trial court thereby affording that body the full opportunity of appreciating all incorrect aspects of the action taken or to be taken. Defense counsel objected and objected vigorously in the district court but in this court has added to the list of claimed grounds of deficiency. Our consideration of the claimed deficiencies is not necessarily in the order of their significance.

■ Defendant asserts that the first prerequisite to admission is that, even after having been displayed the memorandum, the witness has no present recollection. We agree with this statement as a general proposition but find that the parties are in disagreement as to what the record reflects by way of lack of present recollection.

The defendant summarizes the transcript as follows:

"During the course of her direct examination, she testified that, during a telephone conversation, the defendant told her that LaPosi didn't have much of a chance but that if she came up with money he would have a better chance; that she gave the defendant the sum of $300 for which he gave her a receipt. She could not remember any further conversation that took place between them at that time."

We are not aware of the source for tying down further conversation to "at that time." The transcript shows:

"Q. Mrs. Gilarski, can you tell us, please, if you can recall, what, if anything, did Mr. Senak say to you when you paid him the $300?

A. He said nothing.

Q. What, if anything, did you say to him as you handed him the $300?

A. Nothing.

Q. Did any further conversation take place between you?

A. Not that I can remember."

Since Gilarski had already said she could not remember anything Senak said to her nor anything she said to him at the time the $300 was paid, it would appear it would have been fruitless to ask about "any further conversations" "at that time." That counsel did not so intend to limit the question is indicated by his next question which was whether her recollection would be refreshed "about the details of some of these conversations if I were to show you a copy of the statement. . . ." Counsel for the defense was aware of the contents of the statement and would have known that there was a conversation with Senak subsequent to the date of the $300 payment. The objection that the witness had recollected everything to the point in time to which she had testified and therefore there was no reason for the application of past recollection recorded could have been simply stated and equally simply remedied by Government counsel making it clear that he was inquiring as to any further conversations at a subsequent time. Indeed, during the ensuing colloquy, defense counsel stated, "[s]he has testified to *practically* everything that is in that statement." (Emphasis added.)

2. We deem the "1961" reference to be a typographical error in the transcript as the statement was dated 1971 and there is no indication whatsoever of any FBI activity a decade earlier in respect to the investigation of Senak.

■ In considering this aspect of the claim, we note a discussion of the requirement of no present recollection in McCormick's Handbook of the Law of Evidence, 2nd ed. § 302, at 714–15 (1972). The author after surveying the areas of disagreement in the application of the principle concludes:

"An accommodation of these various aspects may be found in phrasing the requirement as a lack of sufficient present recollection to enable the witness to testify fully and accurately, a standard which is gaining adherents."

In our opinion this standard is consistent with the modern concept of the admissibility of relevant evidence and we adopt it. We hold that there was sufficient shown insofar as lack of present recollection was concerned to entitle the statement to be admitted.

Relying on that part of Rule 803(5) of the new Federal Rules of Evidence that if the recorded recollection is admitted, "the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party," the defendant claims error in the fact that here the statement was in addition to being read to the jury allowed in as an exhibit and taken to the jury room with other exhibits.

The trial in the present case took place in October 1974 and the new Federal Rules of Evidence did not become effective until July 1, 1975. Nevertheless, four years before the effective date, this court in *United States v. McCarthy,* 445 F.2d 587, 591 (7th Cir. 1971) expressed the belief that the proposed Rules "should be used by the district courts as guidelines and at least given consideration in the exercise of their discretion in making evidentiary rulings." Also, in the present case the district court had indicated that it intended to apply the new Rules.

■ Whether receiving the past recollection recorded memorandum as an exhibit when it has not been offered by the adverse party would invariably constitute reversible error, now that Rule 803(5) is effective, as to which we express no opinion, we find no basis for reversing here. In the course of objecting to the evidence, the defendant focused on the reading of the document to the jury:

"I further object to it being read to the Jury that singles out this particular exhibit. It's an exhibit and should be treated as any other exhibit, and going to the Jury Room as any other exhibit."

Under these circumstances, to hold that the fact that the document did go into evidence as an exhibit was reversible error would be an overly technical application of a Rule not yet effective which we do not find ourselves compelled to do.

The parties appear to be somewhat ambiguous in their treatment of the impact of the statement. The defense refers to a statement of the prosecutor during the objection-colloquy to the effect that the witness's testimony was not too far from what she had said on prior occasions, and then points out additional matters in the statement to which she had not testified during the trial. On the other hand, during the colloquy, defense counsel, as we have previously noted, stated that "[s]he has testified to practically everything that is in that statement." We are of the opinion that there was sufficient additional incriminatory information in the statement that we could scarcely say that it did not add to the Government's case. Indeed, the very fact of corroboration of a witness's testimony by the fact that she had previously stated substantially that which was in her testimony would strengthen the case. This, however, is not determinative of the question of admissibility.

Senak also objects to the fact that twice he was denied the opportunity to voir dire the witness prior to the admission of the statement for the purpose of making a more specific objection. He points out that upon subsequent cross-examination numerous factors developed:

"[T]hat the interview took place over a two hour period; that she didn't know

if the agents were taking down everything that she said; that they were writing and taking notes; that the statement was a summary of the conversation over a two hour period; that the statement really didn't represent what she said; it represented the FBI Agent's impression of what she said. The statement was not in her handwriting; she had no recollection of reading the statement over before she signed it; and, after having read the statement over and later heard it read again in open court, she didn't know whether she said any of the things in the statement and that she was not under oath at the time."

■ A trial judge always has a difficult decision when confronted with the request to voir dire or preliminarily question a witness for the purpose of lodging an objection to testimony about to be offered. This procedure should not be utilized, as it sometimes is, as anticipatory cross-examination for the purpose of devitalizing proposed evidence before it has ever been received. The trial judge, however, can exercise control over the scope of such out-of-order interrogation and can put a stop to it if it exceeds its proper scope. We think the better practice here would have been to permit some voir dire questioning of the witness. However, the defense was permitted to develop fully on cross-examination all of the frailties which it now attributes to the statement. The objection which we deem the most significant one which could have been raised, and which we will treat hereinafter, that of the freshness of the recollection at the time the statement was taken, was obvious on the face of the situation and needed no voir dire. What was developed by cross-examination in view of the explicit testimony of the witness that the statement was true at the time she was interviewed by the FBI agents goes only to the weight to be accorded to the statement. In reviewing the exercise of discretion and that which was developed by the vigorous cross-examination of Gilarski, we note the district court's statement to counsel out of the presence of

the jury and before the admission of the statement that "[i]t's obvious the witness is frightened beyond description." While under our adversary system the scared truthful witness must be just as much subject to searching cross-examination as the glib liar, the trier of fact is given the difficult task of discerning whether matters affecting the weight of the witness's testimony result from a lack of verity or from trepidation.

■ From our reviewing point of view, we, of course, do not ordinarily determine the question of credibility. Nevertheless, in evaluating that which was brought out in cross-examination as either being so destructive as to preclude admissibility or merely being that which is to be considered in the weight-giving process to be performed by the trier of fact we find some illumination in the observation of the judge concerning the witness. Since we view that which was brought out as not precluding admissibility if it had been permitted to be developed on voir dire we are not persuaded that the denial of the opportunity constituted such an abuse of discretion as to require a reversal.

On appeal, Senak argues that "the most apparent defect" in the predicate for admissibility is that it fails to meet the requirement that the memorandum be made when the events were fairly fresh in the memory of the witness. The fact that it was made three years after the event, of course, was just as apparent at the time of the trial as it is now, yet at no time was this advanced as an objection to the admission and there was no motion to strike the statement on that ground.

Not only was the lapse of time obvious on the face of the situation but when the trial judge was in the process of determining whether the statement would be admitted he observed:

"McCormick on Evidence says this: I'm going to read it. This is from Section 279 on page 594:

'Records of Past Recollection'.

'The typical and classic record of Past Recollection was a one-man af-

fair. The verifying witness was the one man who originally observed the facts and the man who wrote them down . . . One deviation from this pattern, however, we have already mentioned. This is the situation where the written statement is made by someone other than the witness, but the witness verifies it for admission by testifying that when *his own memory of facts was fresh*, he read the memorandum and knew that it was true. Here only the witness who recognized the truth of the memorandum need be called.'" (Emphasis added.)

The quotation by the judge was from the first edition of the Handbook on Evidence by Professor McCormick (1954) and the reference to freshness of memory was incidental to the primary scope of discussion being that of co-operative records and reports. Nevertheless it would appear to us that the reference was more than sufficient to have triggered at that time, not for the first time on appeal, an objection based upon the fact that the statement resulted at an interview taking place some three years after the occurrence of the events related in the statement. Indeed, the reference would appear to be a patent invitation to such an objection. To stress grounds of objection such as that the Government had not produced the FBI agent to testify that he took the witness's statement down verbatim and that this was hearsay as to the defendant could only serve to divert the trial court's attention from that which the defendant on appeal characterizes as the "most apparent defect." Our considera-

tion of the present issue must be on the basis that reversal would be required only if we are convinced that there was error so plain and clear that Senak was denied a fair trial.

In the same first edition of McCormick from which the district court quoted, the freshness of memory aspect is dealt with separately in § 277, at 591 as follows:

"The usual requirement for witnesses and for hearsay declarants that they must have had first-hand knowledge of the facts is enforced here. But the most distinctive requirement is designed to guarantee that this knowledge must have been clearly and accurately remembered by the witness who tenders the writing, as of the time that he made or recognized the correctness of the writing. An older, strict formula, still commonly used, is that the writing must have been made or recognized as correct 'at or near the time' of the events recorded. This limitation has some support in psychological findings. More liberal is the standard often found in the opinions and preferred by Wigmore, namely, at a time when the events were 'fairly fresh' in the memory of the witness. The last test seems the more practical and it should be flexibly administered. It is true that the nearer to the event the more reliable the statement is likely to be, but it is equally true that all statements made substantially nearer to the event that the trial itself suffer less from errors of memory than the testimony of witnesses from purported present recollection on the stand." [3] [Footnotes omitted.]

**3.** The second edition of McCormick's Handbook (1972) prepared under the editorship of Professor Edward W. Cleary with various professorial contributing authors, has some change of verbiage on the subject but both texts adhere to favoring a more liberalized view on admissibility. The second edition text is as follows:
 "The writing must have been prepared or recognized as correct at a time close to the event. Some opinions use the older strict formulation that requires the writing to have

been made or recognized as correct 'at or near the time' of the events recorded. This finds some support in psychological research suggesting that a rapid rate of forgetting occurs within the first two or three days following the observation of the event. But the tendency seems to be towards acceptance of the formulation favored by Wigmore which would require only that the writing be made or recognized at a time when the events were fairly fresh in the mind of the witness. No precise formula can be applied to deter-

While in at least one case there is a suggestion that the statement must be recorded contemporaneously with the event, *Dickinson Supply, Inc. v. Montana-Dakota Utilities Co.*, 423 F.2d 106, 109 n. 1 (8th Cir. 1970), we believe the better view is that the discretion of the trial judge should not be rigidly bound by an inflexible rule but rather that it should be exercised on a case-by-case basis giving consideration to all pertinent aspects including the lapse of time which reasonably and properly bear upon the likelihood of the statement being an accurate recordation of the event to which the memory related. Of course, the likelihood of accuracy only justifies admission but does not preclude an effort, as in the present case, to persuade the trier of fact that matters in the statement are not factually correct.[4]

It is not unusual to read a record on appeal in which it is clear that the witness who is testifying is many more than three years removed from the events as to which he is testifying. Of course, such a witness is subject to immediate cross-examination. Here while the witness was subject to ultimate cross-examination she was not subjected to this procedure at the time the statement was given, which, if it had occurred, could arguably have resulted in changes or variations in that which she related to the recording agents. Nevertheless, the fact that there is no rule, other than the credibility scrutiny of the trier of fact, which curtails the lapse of time applicable to the live witness on the stand, would suggest that we should not arbitrarily say any given length of time is too long for the statement-giver to have an accurate memory and for a proper application of the past recollection recorded procedure.

Here the time was three years. We are unaware of any cases where this amount of time has been involved. We are not unmindful that there are cases in which a much lesser period of time has been held to be fatal to admission. Thus, in *Gigliotti v. United Illuminating Company*, 151 Conn. 114, 193 A.2d 718, 723 (1963), in which the written statement was signed about six weeks after the event, the reviewing court held that the trial court was fully justified in excluding the statement on the ground that it was not made at or about the time of the events recorded in it. The trial court had based its exclusion on several independent grounds but the appellate court apparently deemed there was no necessity to give consideration to whether in fact the witness's memory might have still been fresh enough to justify admission. An analytical approach to the rule with a discussion of its underlying rationale is found in *United States v. FMC Corporation*, 306 F.Supp. 1106, 1137–38 (E.D.Pa., 1969). The court there adopted the Wigmore standard that the past recollection must have been sufficiently fresh and vivid to be probably accurate and properly, in our opinion, emphasized that there should be no inflexible criteria for determining when a writing is so remote from the events described as to make it inadmissible. In excluding the proffered grand jury testimony, the judge in *FMC* gave significance to the memory lapses of the witness at the time of his appearance before the grand jury the transcript of which was the recordation in question and held therefore that there were inadequate safeguards to insure the accuracy and trustworthiness of the grand jury testimony.

From our examination of the record in the case before us we have no question but that the district court was convinced that the statement accurately reflected the witness's version of the events as

---

mine whether this test has been met; perhaps the best rule of thumb is that the requirement is not met if the time lapse is such, under the circumstances, as to suggest that the writing is not likely to be accurate." [Footnotes omitted.] (Sec. 301 at 714.)

4. We are not impressed by the Government's explanation that the witness was not interviewed until 1971 because the Government's investigation did not begin until that time. The question is whether when the witness was interviewed was her memory fairly fresh.

they occurred. Confining the admissible portion to factual matters only, the court excised two phrases which the defendant described as conclusions: "[h]e led me to believe that if I didn't pay him, Steve LaPosi would not have a chance in trial court," and the italicized portion of the following, "On the day Steve was found not guilty, Nick Senak contacted *me for the purpose of obtaining more money.*" The statement as it went into evidence displayed no lapses of memory as was the situation in *FMC, supra,* but was specific in detail and was not inconsistent with that which the witness was able to recall when on the witness stand during trial. It appears obvious that Gilarski had read the statement as she had initialled several strikeouts in the text. Particularly significant is the fact that stricken and initialled was the phrase, "I knew that Nick Senak was a pauper's attorney." The agents had apparently written this in the statement but it had been stricken at the time of writing as having not been known by her at the time to which it related. Also, at one point the word "fall" as the time of a payment had been stricken and initialled with "Summer" being substituted. The trial judge could not have been unmindful of the fact that this was not a case where a witness was going back three years in time to attempt to resurrect facts which would have made no particular impact upon her memory. This obviously was no routine series of transactions but involved a dealing with a lawyer in an effort to get "a chance" for her boyfriend in relation to the criminal charges which had been brought against him.

██ Under all of the unusual circumstances of this case, we are not persuaded that the introduction of the statement requires a reversal.

### IV

Senak's next contention of error relates to the admission of the testimony of Robert L. Becker, the cousin of one Anna Zolkes, who was charged with voluntary manslaughter and who was represented by the defendant as a private attorney and not as the pauper attorney.[5]

Becker testified that he learned his cousin was represented by an attorney and he met with her and the attorney who was the defendant. He then testified as to a conversation he had with Senak, the substance of which was as follows:

He was introduced to the defendant by his cousin, Anna Zolkes; he asked what the charges were; the defendant said they hadn't been brought yet, that this was a preliminary hearing. He asked the defendant about bail bond; the defendant didn't know but said that his cousin was in a lot of trouble; she had killed her husband. The defendant asked Anna Zolkes how much money she brought; Mrs. Zolkes opened her purse and gave him the money she had. He stated the defendant looked through her purse and took the change and said "If I don't get some money, I can't defend this girl."

The witness asked the defendant how much money he wanted; the defendant said "I should have a retainer of $3000.00." The witness said, "This woman can't afford you; tell me who the pauper attorney is." The defendant stated, "I'm the pauper attorney and if I represent her as a pauper attorney she'll go to jail, she'll be charged with first degree murder and get the chair."

There was a bondsman present during the discussion and the witness gave the bondsman either fifty dollars or a hundred dollars and gave the defendant a post-dated check for one hundred and fifty dollars.

The defendant concedes that the testimony was offered by the Government for the purpose of showing intent, scheme, motive, design, and plan. The

---

**5.** While Becker testified that to his knowledge, Anna Zolkes was entirely destitute and had been for months, it is clear that she had never made any request for pauper counsel and that the defendant was never formally appointed as pauper counsel in her case.

defendant, pointing out that "[o]bjection to the testimony was made on the basis that it did not constitute evidence of similar crimes," cites to us cases dealing with the matter of the admission of evidence of other similar crimes. This is followed by the assertion, without citation of supporting authority, that the sine qua non for admissibility under any theory is that the evidence constitute a crime. The defendant then concludes that since this was a private relationship there could have been no crime.

 We do not agree that similar acts introduced to establish motive, intent, the absence of mistake or accident, or a common scheme or plan must necessarily be acts constituting a crime. Probably most of the cases dealing with the precise issue have involved other acts which were of a criminal nature because of the courts' concern that a defendant may be unduly damaged in the eyes of the trier of fact by being considered a common criminal, or in other words, the defendant would be being tried on the purity of his character rather than on his guilt or innocence of the crime charged. The defendant here finds himself in the somewhat dilemmatic position of relying on the cases in which the admissibility of evidence of other crimes was the issue while denying that the acts involved in the testimony amounted to a crime.

As Wigmore points out, 1 Wigmore on Evidence, (3rd ed. 1940) § 216 at 712–18 and 2 *Id.,* § 305 at 205–6, the criminality of other acts does not affect their admissibility; either they are relevant or they are not, in which case they are rejected; and the only bearing of their having the quality of criminality is that the undue prejudice involved in acts which are crimes is another reason for excluding them. Here we do not, by the defendant's own argument, have the additional undue prejudice which would flow from other acts of a criminal nature.

Rule 311 of the Model Code of Evidence of the American Law Institute is quoted as having been previously applied in the circuit in *Swann v. United States,* 195 F.2d 689, 690–91 (4th Cir. 1952):

"Rule 311. Other Crimes or Civil Wrongs. Subject to Rule 306, evidence that a person committed a crime or civil wrong on a specified occasion is inadmissible as tending to prove that he committed a crime or civil wrong on another occasion if, but only if, the evidence is relevant solely as tending to prove his disposition to commit such a crime or civil wrong or to commit crimes or civil wrongs generally."

The new Federal Rules of Evidence similarly appear to recognize that the other acts need not be crimes. Rule 404(b) provides as follows:

"Evidence of other crimes, wrongs, or *acts* is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." (Emphasis added.)

 Since the underlying basis of the charge against Senak was that he used his position to extract money from persons under threat of inadequate legal representation unless the sums were paid, we cannot say that the court erred in determining that the evidence was relevant to Senak's plan and intent as reflected in the evidence pertaining to the counts on which he was found guilty. Further, we note that the purpose for which the evidence was admitted was properly delineated in the court's instructions:

"If the jury should find beyond a reasonable doubt from other evidence in the case that the accused did the act charged in the particular Count under deliberation, then the jury may consider evidence as to an alleged earlier act of a like nature in determining the state of mind or intent with which the accused did the act charged in the particular Count. And where proof of an alleged earlier act of a like nature is established by evidence which is

clear and conclusive, the jury may, but is not obliged to, draw the inference and find that, in doing the acts charged in the particular Count then under consideration, the accused acted wilfully and with specific intent, and not because of mistake or accident or other innocent reason."

■ The defendant also complains that the court refused to hear the testimony of Zolkes outside the hearing of the jury to establish the nature of her relationship with Senak even though the Government had subpoenaed her and she would have been available to testify prior to the Becker testimony. However, the nature of the relationship as being private was not in dispute. Further, the defendant complains that the Government never did call her as a witness. However, it is not shown that she would have established by her testimony any matter other than the private attorney-client relationship which she had, as to which there was no dispute.

■ Finally, on this point, the defendant complains that he was denied the opportunity to show a pattern of lawful conduct to rebut the testimony of Becker. We find no merit in this contention as it appears the defendant was given wide latitude in showing the practices in the Lake County Criminal Court with regard to the conduct of the office of pauper attorney.

## V

The next contention of error is that the court permitted cross-examination of Senak which showed that he had failed to report on his ledger sheets a $100 payment by a Mrs. Daugherty and that he had reported a $2500 fee with respect to Mrs. Zolkes and that the I.R.S. investigation culminated with an assessment based on a $3400 fee for that particular matter. The gist of the argument is that since there had been no conviction for income tax evasion or similar crime, the evidence should have been excluded.

We have previously referred in this opinion to the snowballing development of this subject in connection with the prosecutor's closing argument. On this appeal, the defense confines itself to the Daugherty and Zolkes transactions since neither were the subject of indictment. However, the first push of the snowball was administered with regard to the Cadle fee which was involved in an indictment count on which Senak was being tried.

On cross-examination, the defendant testified that he felt he was legally and lawfully entitled to the amount received from Cadle. He was then asked if he had reported this amount on his 1966 income tax return. Counsel objected on the basis that the question was outside the scope of the issues. Before the district court had indicated any ruling on the evidence, Senak, himself, stated, "I'll answer that question," and then proceeded to state that if the record indicated the payment had not been reported it was neglect on his part. This was followed by the introduction of the records Senak had turned over to the I.R.S. upon which Senak conceded that there was "no indication here of Mr. Cadle."

■ Without determining whether the door may not have been opened by the foregoing development pertaining to Cadle as to the reporting of all fees as to which there had been evidence, we do not agree that the introduction of the evidence required a showing that there had been a criminal conviction. After the evidence was all in it was clear that the evidence only showed that income had been received which had not reached the records. This may or may not be a criminal offense. Senak offered his own reasons for the failure. This was not a case of attempting to impeach a witness by showing that he had been charged with or arrested for the commission of a crime. The evidence, however, could have been found relevant by the trier of fact to the question of Senak's credibility, he having taken the witness stand. A substantial number of witnesses had testified on behalf of the defendant that his reputation for truth and veracity in the community was excellent. Senak

contended at trial that all of the fees referred to in evidence were proper and lawful, yet they were not recorded either wholly or in part in his records of receipts.

Senak relies upon Rule 608(b) of the new Federal Rules of Evidence pertaining to the use of specific instances of non-criminal conduct. The Government again argues that the Rules were not effective at the time of the trial. Even if they were we do not find great help to the defendant as extrinsic evidence of the conduct of a witness may, under the Rule, be inquired into on cross-examination, in the discretion of the court, if probative of truthfulness or untruthfulness concerning the witness's character in that respect.

In our opinion, the district court did not abuse its discretion in deciding that the probative value of the particular evidence outweighed any prejudicial character it may have had. *United States v. Kaufman*, 453 F.2d 306 (2nd Cir. 1971); *Simon v. United States*, 123 F.2d 80 (4th Cir. 1941), *cert. denied*, 314 U.S. 694, 62 S.Ct. 412, 86 L.Ed. 555.

## VI

Robert A. Lucas, a prominent attorney who practiced in the county, was called as a character witness by the defendant and testified, in response to questions couched in the present tense, that Senak's reputation in the community for honesty, integrity, truth, and veracity was excellent. The witness who was one of six character witnesses was asked upon cross-examination if he had any knowledge as to the allegations made by the various Government witnesses in regard to this defendant. Senak contends this was error because it involved charges which were in issue in the case, citing the annotation at 47 A.L.R.2d at 1303–06 (1956). That authority, in reliance upon state court cases from Alabama, Kentucky, and Texas, categorically states that "[i]t is error to permit the cross-examination of the defendant's character witness as to whether he has heard that the defendant committed the act for which he is on trial, since such cross-examination must be confined to acts antecedent to the commission of the offense for which the defendant is on trial." *Id.* at 1303–04. (Footnote omitted.)

The rationale of this statement is probably found in the opinion cited in the annotation of *Stephens v. State*, 128 Tex.Cr.R. 311, 80 S.W.2d 980 (1935) to the effect that the fact that the defendant who was indicted in the case on trial should not be proved to be of bad reputation at time of trial solely because of alleged discussion of the alleged offense for which he was on trial since he was presumed innocent until convicted. While this approach has some appeal, we do not deem that the test, at least in federal practice, can be as simply delineated as has been done in the annotation.

The difficulties of determination of the scope of cross-examination are analyzed and discussed in *Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), as a result of which the Court concluded on the matter of appellate review as follows (at 480, 69 S.Ct. at 221):

"Both propriety and abuse of hearsay reputation testimony, on both sides, depend on numerous and subtle considerations, difficult to detect or appraise from a cold record, and therefore rarely and only on clear showing of prejudicial abuse of discretion will Courts of Appeals disturb rulings of trial courts on this subject." (Footnote omitted.)

The subject is also extensively discussed in *United States v. Lewis*, 157 U.S.App.D.C. 43, 482 F.2d 632 (1973). There the court while recognizing the dangers of undue prejudice in adversion to conduct subsequent to the events in issue nevertheless laid down a flexible test (at 642):

"Some discretion in the matter is more in keeping with the broad latitude which judges have as to the admission of character testimony, and which traditionally they have exercised over the scope of cross-examination, than is any

inexorable rule on the subject. A measure of discretion imparts to the proceedings a desirable degree of flexibility to shape the judge's ruling to the 'numerous and subtle considerations' appearing. Not every situation calls for exclusion of questions exploring knowledge of events occurring after the time in issue. Not every subsequent event is an unacceptable topic, nor a topic so prejudicial as to outweigh its probative significance; some events otherwise objectionable perhaps could be made unobjectionable. A decision to permit inquiry respecting subsequent events should, of course, be reached cautiously, and only for the best of reasons. But in the final analysis the matter should be left to careful handling by the trial judge, subject to appellate correction only where mishandling is clear." (Footnotes omitted.)

In examining the question of whether the permission over objection of the particular cross-examination, which was confined to one of the character witnesses only, a lawyer who arguably at least might have been in a better position to evaluate the community reputation of the defendant from the point of view of the impact his conduct as a lawyer had had on his reputation in the community, constituted an abuse of discretion, we note the following. The defendant had been permitted a broad spectrum of proof of good character—honesty, integrity, truth, and veracity. This was not confined to the time of the incidents for which he was being prosecuted or close thereto but was brought down to the time of the trial. The trial court subsequently permitted a lay witness to testify over Government objection that Senak "is in my relations with him as Assistant Pastor to be [sic] an honest man, to be trustworthy." Lucas was not asked whether, if he had known the incidents to have been true, it would affect his opinion nor indeed was he asked to

express any opinion on the effect of the incidents which were not described to him.[6] Finally, at the conclusion of the cross-examination, the witness testified that although he had no personal knowledge of the incidents earlier inquired about he had read newspaper accounts concerning the allegations, and "of course, in the course of association with other professional persons, I have generally heard of the gist of the Government's charges against the defendant . . . from my past association and experience with the defendant, I would believe that I still feel that he is a man of integrity and honesty." This he based on Senak's reputation in the community and his association with Senak for 25 years.

 Under these circumstances, we do not find the permission of the particular cross-examination to be an abuse of discretion.

### VII

At the time of the involved incidents, the judge of the Lake Criminal Court was John H. McKenna who had appointed the defendant as pauper attorney. McKenna testified extensively as to the custom and usage in the court with respect to pauper attorneys; that during his tenure and that of his predecessors, the pauper attorney was authorized to appear as private counsel for persons he had been appointed to represent if it developed that that person or his friends or relatives had engaged him as private counsel. McKenna also testified over Government objection that there was no difference in the quality of Senak's representation whether he was representing an indigent or a person who had hired him privately and that his representation of defendants was excellent.

Prior to cross-examination of McKenna, Senak sought a protective order to prevent the Government from alluding in any way to the trial of McKenna on a

---

**6.** A typical question was: "Have you any knowledge as to allegations by Honore Gilarski as to this defendant?"

charge of federal income tax evasion for which he had been acquitted. The trial judge ruled that the question referring to the trial which the Government had proposed to ask could not be asked unless the witness stated that he was biased against the Government. In response to the question of whether he had any bias against the Government "in this case," McKenna replied, "I have no bias. I'm here as a witness to tell the truth." However, when asked, "Specifically, Mr. McKenna, do you have any bias against the Department of Justice?" the witness stated, "On occasion I have." The Government then asked permission, which was granted, to pursue the matter of the "occasion." After some colloquy as to the form of the question, the witness was asked, with defense objection being denied:

> "Q. Now you said 'on occasion' in response to my past question, Mr. McKenna. And wouldn't this be the occasion that you are biased against the Department of Justice because they, in fact, prosecuted you, although unsuccessfully, for income tax evasion?"

McKenna responded that that was not the reason and when pushed further as whether he had any bias against the Department of Justice on that account he responded, "Like any other citizen, I have my opinion." When informed by the court that he had to answer the question with a "yes" or a "no," he responded by the latter. The Government then left the matter.

The gist of the defense argument is that the Government was attempting to impeach the credibility of McKenna by showing that he had been accused of a crime and that this was improper in the absence of a conviction. The defense misconceives the basis upon which the court permitted the inquiry. As the court stated,

> "You're talking about convictions that go to the question of credibility. This is an area where you're talking about bias or prejudice or hostility that might have been engendered.

"But until I am persuaded to the contrary by [Government counsel], I am going to hold that if he says that he is not, that he may not ask that next question."

3A Wigmore, Evidence § 949 at 784–90 (Chadbourne rev. 1970) points out that the range of external circumstances from which probable bias may be inferred is infinite and that too much refinement in analyzing their probable effect is out of place. While further observing that exact concrete rules are almost impossible to formulate, the author then has no trouble in being specific as to bearings to be found from the fact that a witness is or has been under indictment:

> "(1) if the indictment, present or past, was had by the *opponent's procurement* or for an injury to him, it is relevant as having tended to excite in the witness a hostile feeling to him." (*Id.* at 790) (Emphasis in the original.)

Here, it may be fairly assumed the Department of Justice had been instrumental in procuring the indictment against McKenna, and therefore, the inquiry might properly have been pursued without McKenna's admission that on occasion he had been biased against the Department of Justice. Having admitted that, we have no difficulty in determining the present contention to be without merit.

## VIII

While civil rights cases, including criminal prosecutions under 18 U.S.C. § 242, are no strangers to the courts, the factual context of the present case is sufficiently of first impression stature as to impose limitations on the resort to form books for significant portions of the jury instructions. It is not surprising therefore to find that the parties and the court devoted substantial attention to the matter of settling the instructions. We have carefully reviewed the transcript both as it pertains to the objections to instructions to be given and those refused and as it pertains to the actual charge. While the defendant at-

tempts to find reversible error in certain phrases and portions of the instructions given, we are of the opinion that, when those singled-out portions are viewed in the context of the total charge, the jury was fully and fairly informed of the applicable law and the rights of the defendant inherent under our system of justice. Likewise, we find no error in the refusal of certain instructions tendered by the defendant.

■ The defendant first attacks portions of the charge pertaining to a delineation of what the Government was required to prove to demonstrate a violation of section 242. The court in this respect emphasized, and indeed throughout the instructions continued to emphasize, the necessity that the Government had to prove each of the elements of the crime charged beyond a reasonable doubt. Since the indictment charged that the defendant deprived the named persons of property without due process of law, it became necessary for the court to essay into the important, but difficult,[7] matter of definition of that concept. The defendant particularly objected to a portion of the instruction claimed to be mandatory but not containing all of the elements of the offense. In the objections, the defendant had specified the missing elements as being the standard of reasonable doubt and not setting out the burden of proof. As a matter of fact, the same paragraph in which the challenged portion appears referred to a finding beyond a reasonable doubt. In any event, the paragraph was just one continuing portion of a definitive instruction pertaining to the statute and the indictment brought under it. The complained-of missing elements were more than adequately covered in the instructions and no one paragraph is expected to include all phases of the litigation.

■ We do not read this portion of the district court's charge as does the defendant. When the jury was told that Senak, as Public Defender, was not entitled to any money from the clients he was appointed to represent, the fact finding body was told nothing more than that during the time he was serving as pauper attorney he was not entitled to other fees. This, of course, did not preclude the proper termination of that relationship and a retained status thereafter if the clients or their relatives had funds for that purpose. This, on the other hand, is not to mean that a person who was entitled to representation under the rules of the court should have extracted from him money on the basis of threat that continuance as or service as pauper attorney would provide a less adequate defense than would be given on a retained basis. As the district court stated in one portion of the instructions: "As a matter of law, the defendant, Nick Senak, was required, as a Public Defender, to provide his clients with nothing less than adequate legal protection."

The court gave examples of deprivation of property without due process for exemplary purposes; however, in his objections to this portion of the charge, the defendant overlooks that the jury was told each of "the persons involved in this case who were allegedly deprived of property had the continuing right to use and control his own property, including money, until such time as he *voluntarily* disposed of it *or* it was taken from him by means of due process." (Emphasis added.) Since much of the defense was based upon a claim that the payments were voluntarily made, the issue was squarely posed for the jury as to the circumstances under which the payments in fact were made.

We also read the instructions as not saying, as the defendant contends, that once Senak was appointed, the only way money could be secured from the clients or their relatives was through suit by the county attorney. That the jury did not so understand the instructions is in-

---

7. " But there is no table of weights and measures for ascertaining what constitutes due process." Mr. Justice Frankfurter in *Burns v.* *Wilson*, 346 U.S. 137, 149, 73 S.Ct. 1045, 1052, 97 L.Ed. 1508 (1953).

dicated by their acquittal on Count III.[8] In sum, we do not agree with the contention that the jury was told "that once the defendant had been appointed as public defender for any person the defendant could under no circumstances take money from that client or friends or relatives of that client."

■ The defendant also claims error in the portion of the instruction given to the effect that it was necessary to show or to prove that the defendant was thinking in constitutional terms. The defendant's reliance on *Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) is misplaced. Here, as contrasted with *Screws*, the jury was instructed that it was not sufficient to find that the defendant had a generally bad purpose. It was made plain to the jury that specific intent must be established, that "the Government must prove that the defendant knowingly did an act which the law forbids, . . . purposely intending to violate the law." During the course of instructing on specific intent, the court made reference to the lack of necessity of showing that the defendant was thinking in constitutional terms. But this phrase appears in *Screws*: "The fact that the defendants may not have been thinking in constitutional terms is not material where their aim was not to enforce local law but to deprive a citizen of a right and that right was protected by the Constitution." 325 U.S. at 106, 65 S.Ct. at 1037.

■ Finally, with regard to instructions, Senak complains of the refusal to give three of the instructions tendered by him. Each of the instructions concludes by the mandatory, "you must find the defendant not guilty." No. 3 would have led to that result if the persons named in each Count were not entitled to the services of pauper counsel. In his objections at trial, the defendant argued that this was particularly important as to the Drake count, but, as noted above, there was an acquittal on that count. In any event, this would have introduced an entirely collateral, irrelevant inquiry. The issue before the court pertained to the deprivation of property in connection with persons charged with state crimes during a time that Senak was the appointed counsel. To decide his guilt or innocence on the basis of whether the state court should not have appointed him or should not have continued the appointment would be an improper criterion. No. 4 would have required an acquittal based in part upon the asserted law that the appointment of a public defender created no rights for relatives or friends of the accused person. However, we are here dealing with whether constitutional rights to property suffered deprivation and these rights were shared by the relatives and friends as well as those charged with the local crimes. No. 5 would have mandated an acquittal if the jury had found that Senak was authorized to appear as private counsel for those he had been appointed to represent and had been authorized to accept payments in such event. However, the indictment was not concerned with this conjectural possibility. What it was concerned with was the allegation that Senak conditioned his representation of persons for whom he had been appointed as pauper attorney on the payment of money to him.[9]

IX

■ Finally, in a two pronged attack the defendant contends that his motion for judgment of acquittal at the close of the evidence and a similar motion after verdict should have been sustained. The

8. In Count III, Senak was charged with depriving Ernest Drake of $180 to defend Drake's nephew. On cross-examination, it was developed that the money came from the sale of a motor bike which belonged to the nephew. The jury could have concluded that Ernest Drake was not deprived of any of his own property and, of course, the money was not paid by virtue of a suit for recoupment by the county attorney.

9. The issue was succinctly put by defense counsel in his final summation: "[i]f you are convinced beyond a reasonable doubt that this man threatened these people with inadequate representation, yes, you should find him guilty."

defendant candidly admits that the second portion of the attack is primarily based upon a claim that the indictment fails to state an offense against the United States and that this has been determined adversely to the defendant in the prior appeal. *United States v. Senak, supra.* We agree with his analysis and respect the defendant for his candor. We, however, upon reexamination of the prior opinion decline to agree that it was erroneous. We find no merit in the contention that the failure to grant the motion for acquittal as to the Count III (Drake) was improper or that it somehow tainted the other verdicts. We have examined the evidence in the light most favorable to the Government as we are bound to do on this appeal and in that light are unable to agree that there was not sufficient evidence to support the verdicts of guilty on Counts II and IV, which counts, as we have previously held, did state an offense against the United States.

In his original appellate brief on the present appeal, the defendant, again with candor, argues that "[a]ll that the evidence in this record shows is that the defendant may have illegally charged a fee to perform a pre-existing duty." That which the jury could have found proven goes farther than that. It adequately supports the verdict of guilt of deprivation of property in violation of 18 U.S.C. § 242.

From our review of the entire record and consideration of the various errors urged by the defendant we are convinced he was given a fair trial and that the judgment of conviction does not require reversal. Accordingly, the judgment of the district court is

Affirmed.

FAIRCHILD, Chief Judge (concurring).

With respect to Part VII, cross-examination of Judge McKenna, the questions concerning bias against the Department of Justice perhaps bear the analysis that they were within bounds. I do not think, in any event, that this series of questions affected the outcome of this trial, and therefore would not reverse on their account.

I do view them, however, as the type of questionable conduct government counsel should avoid. The suggested analysis is that the fact that the witness has been prosecuted for a federal offense raises some probability that he will color his testimony in favor of another federal defendant. This seems to me gossamer covering for the prosecutor's real hope that the jury will view the witness less favorably because he was charged, though not convicted, with income tax evasion.